**UNITED STATES of America, Plaintiff,**

v.

**Hector GOMEZ–VEGA, Defendant.**

**Criminal No. 04–420 (CCC).**

United States District Court,
D. Puerto Rico.

Oct. 16, 2007.

---

Antonio R. Bazan–Gonzalez, United States Attorney's Office, San Juan, PR, for Plaintiff.

Eric J. Pijuan–Torres, Pijuan Law Office, San Juan, PR, for Defendant.

## ORDER

CARMEN CONSUELO CEREZO, District Judge.

Having considered defendant's Motion to Dismiss Indictment for Lack of Probable Cause to Arrest/Indict Alternate Motion to Suppress and Request Evidentiary Hearing (**docket entry 36**), the United States' Request for Summary Denial of Motion to Dismiss Indictment or to Suppress Evidence, considered as an opposition (**docket entry 40**), defendant's Opposition, considered as a reply (**docket entry 43**), and the Magistrate Judge's Report and Recommendation (**docket entry 158**), to which no opposition has been filed, the same is ADOPTED and the Motion to Dismiss Indictment for Lack of Probable Cause to Arrest/Indict Alternate Motion to Suppress Evidence and Request for Evidentiary Hearing (**docket entry 36**) is hereby DENIED.

SO ORDERED.

## REPORT AND RECOMMENDATION
### INTRODUCTION

CAMILLE L. VELEZ–RIVE, United States Magistrate Judge.

Defendant Héctor Gómez–Vega ("Gómez–Vega") filed a "Motion to Dismiss the Indictment for Lack of Probable Cause to Arrest/Indict Alternate Motion to Suppress and Request for Evidentiary Hearing" which was referred by the Court to the undersigned Magistrate Judge for report and recommendation (Docket No. 122). Gómez–Vega claims there was no probable cause for his arrest, the warrantless search was unlawful and the evidence obtained from the vehicle driven by him, which was seized in violation of the Fourth Amendment, must be suppressed and the Indictment dismissed. (**Docket No. 36**).

The government filed its Opposition to above motion claiming Gómez–Vega's request to dismiss the Indictment at this stage of the proceedings is meritless and Gómez–Vega lacks standing to challenge the seizure and search of the vehicle. (**Docket No. 40**).

Defendant Gómez–Vega then filed a reply claiming defendant has standing to raise the suppression issue because he was the owner of the vehicle in question and had a reasonable expectation of privacy in the vehicle. (Docket No. 43).

On November 14, 2006, the evidentiary hearing started with Gómez–Vega's testimony as to the issue of standing.[1] After hearing the evidence of standing, the undersigned ruled defendant Gómez–Vega had established, at that stage of the proceedings, standing to challenge the seizure of the narcotics and other evidence under the totality of the circumstances and the evidence before the Court. (Docket Nos. 128 and 149, p. 36).

The suppression hearing was re-scheduled and, upon consent of both parties, held on December 13, 2006, March 13 and 27, 2007 and July 6, 2007. (Docket Nos. 130, 137, 138, 150, 151, 152, 153 and 154).

---

1. The First Circuit has ruled that it is a better practice—at least where, as in this case, the answer to the inquiry is plain—to refrain from reaching the merits of a challenged search and seizure unless the movant has succeeded in crossing the standing threshold. *United States v. Aguirre,* 839 F.2d 854, 859 (1st Cir.1988).

The testimonies of Puerto Rico Police Officer ("PRPO") Carlos Piazza, on behalf of the government, and of PRPOs Edilberto Mojica Caldero, Julio A. Gonzalez, Jose Diaz Portalatin, Carmen Santiago Rivera and Mario González Collazo, on behalf of the defense, were heard on the merits.

The transcripts of the suppression hearing were ordered to be transcribed and were filed with the Court on June 19 and 26, 2007 and July 24, 2007. (Docket Nos. 149, 150, 151, 152 and 153).

On July 6, 2007, last day of the suppression hearing, the defense requested time to file a memorandum of law. Defendant was granted twenty (20) days, upon receipt of the transcripts, to file said memorandum and the translations of the exhibits introduced by the defense. The government was granted ten (10) days to file its reply. (Docket No. 153). Defendant failed to timely comply with the filing of said memorandum. Accordingly, on September 11, 2007, an Order was issued granting defendant until September 13, 2007 to file his memorandum and granting the government five (5) days to file its reply. (Docket No. 155).

On September 13, 2007, defendant filed his memorandum without the required translations.[2] (Docket Nos. 156). On September 18, 2007, the government filed its reply to defendant's memorandum. (Docket No. 157).

### FACTUAL BACKGROUND
### STANDING:

**Testimony of defendant Gómez–Vega, as to standing, may be summarized as follows:**

Gómez–Vega, after being properly advised by his counsel and the undersigned

of the possible consequences of testifying at the suppression hearing[3], stated he is thirty five (35) years of age, has a sixth grade education and does not know how to read nor write. Gómez–Vega is the owner of a Lincoln Navigator vehicle which he bought from Raúl Alvárez who was a friend of his. Alvárez sold the vehicle to Gómez–Vega at the end of the year 2002/2003 for $20,000.00 of which Gómez–Vega paid him $9,000.00 and was going to pay him the rest "little by little." Gómez–Vega used the vehicle daily and he had clothing, shoes and personal documents inside said vehicle. On December 13, 2004, defendant Gómez–Vega was the owner of the vehicle.

Exhibit A is a photograph of the Lincoln Navigator which belongs to Gómez–Vega. Gómez–Vega recognized the vehicle by its license plate, to wit: 687–771.

Exhibit B is a photograph of the interior of the Lincoln Navigator which shows the broken interior parts and the console.

Exhibit C is a photograph of the interior of the Lincoln Navigator which shows the dash panel downward.

Exhibit D is a photograph of the interior of the Lincoln Navigator which shows the right part and bottom part of the broken dashboard.

Exhibit E is a photograph of the interior of the Lincoln Navigator which shows the broken air bag and the console.

Exhibit F is a photograph of the interior of the Lincoln Navigator which shows the center console broken.

Exhibit G is a photograph of the rear part of the Lincoln Navigator.

---

**2.** This report and recommendation is issued without the required translations of defendant's exhibits in order not to postpone its issuance. Nonetheless, defendant is remind-ed that he is required to promptly submit to the Court the pending translations.

**3.** Docket No.149, pp. 7–12.

Gómez–Vega testified Exhibits A–G does not depict how the Lincoln Navigator was on December 13, 2004. The difference is that the vehicle is vandalized. The vehicle was in good condition and not with its interior parts broken.

On December 13, 2004, defendant Gómez–Vega was driving the Lincoln Navigator in the Juana Matos Public Housing Project. Gómez–Vega parked the vehicle at said housing project, closed and locked the same.

Gómez–Vega explained the Lincoln Navigator was not registered under his name because the person from whom he bought it (Raul Alvarez) died and he was going to do the transfer of owner of the vehicle with him. Gómez–Vega knows Alvarez died because he laid him to rest at the family's pantheon. Gómez–Vega stated he did not know who Miguel Zambrana Villanueva was and he did not know how Alvarez acquired the vehicle.

On cross-examination, Gómez–Vega testified Alvarez died between March and April, 2003. Gómez–Vega had bought the Lincoln Navigator from Alvarez before his death, for which reason Gómez–Vega never finished paying the vehicle to Alvarez. Gómez–Vega did not make any further payments after Alvarez died. When asked how Gómez–Vega was able to renew the vehicle's registration, even though the vehicle was not under his name, Gómez–Vega stated there are people who do that for a living upon payment of a fee. Gómez–Vega did not renew the vehicle's sticker ("marbete") after the death of Alvarez.

Joint Exhibit I is a photograph of the inspection sticker and renewal of the sticker in the Lincoln Navigator. Joint Exhibit I shows the registration was renewed on June 2004 which is after the death of Alvarez, Gómez–Vega explained there are people to whom you pay a fee and they get you the license, the registration and the

vehicle's tag. Gómez–Vega did not have the registration documents at hand when the sticker was renewed in June 2004. Gómez–Vega paid someone to do it. Gómez–Vega did not get any registration documents from Alvarez. Gómez–Vega paid Alvarez in cash, thus, he has no evidence of payment.

## MERITS:

### Testimony of PRPO Carlos Piazza:

The government presented the testimony of PRPO Carlos Piazza ("PRPO Piazza") which may be summarized as follows:

PRPO Piazza has worked for the Puerto Rico Police Department ("PRPD") as an agent for eight (8) years. On December 13, 2004, he was working in that capacity in the Special Operations Division in which he wears a black uniform different from regular police officers. On December 13, 2004 at around 11:20–11:30 at night, he was with two (2) fellow agents conducting a preventive patrol in the area of the Juana Matos Housing Project. A call was received via the patrol's car radio informing them that, at the Juana Matos Housing Project near the checkpoint No. 2, next to the drug point known to operate there, was a black Lincoln Navigator SUV which was parked. The call mentioned five (5) individuals had been seen inside the Lincoln Navigator and that, among them, there was a fugitive from the law and supposedly they were heavily armed. Therefore, the PRPOs made a call for reinforcement on the radio. Then, the PRPOs proceeded to enter the Juana Matos Housing Project through the entrance they had been told, namely, the second entrance of the housing project. When the PRPOs entered, they observed the mentioned vehicle parked on the street in the entrance to the drug point in an exit position. The officers drove by the Lin-

coln Navigator trying to observe the occupants and saw five (5) individuals inside the Lincoln Navigator. There was a person standing next to the vehicle on the sidewalk talking with someone inside the vehicle. The officers drove passed the Lincoln Navigator about five (5) to seven (7) feet away. PRPO Piazza testified that, when passing by the Lincoln Navigator, he saw defendant Gómez–Vega.

PRPO Piazza was in the patrol vehicle along with fellow PRPOs Edilberto Mojica, who was driving, and another officer. PRPO Piazza was sitting in the front passenger seat.

After passing by the Lincoln Navigator, the officers turned around to be in a more tactical position in relation to the Lincoln Navigator. While turning around, the officers noticed four (4) individuals stepping out of the Lincoln Navigator. Two (2) of the individuals were carrying small bags in their hands and they ran into the interior of the housing project. The man who was standing on the sidewalk by the Lincoln Navigator also ran away. Neither PRPO Piazza nor the fellow two (2) officers followed any of the persons who stepped out of the Lincoln Navigator. The officers proceeded to intervene with the Lincoln Navigator and the driver of the same, identified as defendant Gómez–Vega, who was at the time inside the vehicle.

Once the patrol vehicle was facing in the same direction of the Lincoln Navigator, Gomez–Vega turned on the engine of the Lincoln Navigator and started moving towards a small entrance in the Juana Matos Housing Project where there is a parking space. Gómez–Vega attempted to turn the Lincoln Navigator around but had difficulty because it is a large vehicle. Once Gómez–Vega turned the Lincoln Navigator around and noticed the patrol car was in front of him, he parked the vehicle, turned it off and stepped out of the vehicle.

Then, PRPO Piazza observed Gómez–Vega throw inside the Lincoln Navigator a pistol he was holding in his right hand.

The parking lot was well lighted, there were two (2) utility posts, and in addition, the patrol car's headlights were on and heading in the direction of the Lincoln Navigator and its driver. After Gómez–Vega stepped out of the Lincoln Navigator, PRPO Piazza approached him and asked him if he had any kind of permit to possess or carry a weapon. Gómez–Vega told PRPO Piazza he did not have any kind of license. PRPO Piazza testified the Lincoln Navigator did not have tinted front windows. He looked through the windows and saw the vehicle was closed because the driver closed it. After Gómez–Vega threw the gun inside the vehicle, PRPO Piazza stated he assumes he (Gómez–Vega) closed the vehicle using the automatic locks. When PRPO Piazza looked through the driver's side window of the Navigator, he was able to see a gun inside on the floor in front of the passenger side seat.

Exhibit 3 is a 9 mm pistol with an ammunition magazine which was seized from inside the Lincoln Navigator. It has a tag with PRPO Piazza's name and badge number. The custody of the firearm was passed on to Sgt. Jorge Rivera from the ATF.

The magazine is a 30–bullet capacity magazine. Based on PRPO Piazza's experience, the pistol does not come with that kind of magazine when it is acquired legally, because it is an extended magazine. The magazine was inserted into the firearm when PRPO Piazza saw it through the window of the Lincoln Navigator, thus, it was loaded.

After PRPO Piazza saw the pistol inside, he asked Gómez–Vega if he had a license to possess the firearm. After Gómez–Vega said he did not have a license for the

firearm, the officers read Gómez–Vega his Miranda rights and placed him under arrest. Upon placing Gómez–Vega under arrest, in a matter of minutes, a number of people gathered around the officers in a hostile attitude. Thus, after placing Gómez–Vega under arrest, he was placed inside the patrol car. Gómez–Vega and the Lincoln Navigator were taken to the Bayamón Police Headquarters. PRPO Piazza drove the Lincoln Navigator to the police headquarters.

PRPO Piazza described the Lincoln Navigator as being armored and bulletproof. It is a prepared vehicle in which the windows, doors, top, and body (all the way around) is bulletproof. When PRPO Piazza opened the driver's side door of the Navigator he noticed it was extremely heavy and the windows were about two (2) to two and a half (2 1/2) inches thick.

Once they arrived at the headquarters in Bayamón, PRPO Piazza parked the Lincoln Navigator right in front of the front door of the police headquarters and took Gómez–Vega out of the patrol car into the building. Once inside, Gómez–Vega voluntarily told the PRPOs to be careful when unloading the firearm because it was fixed or altered to fire in an automatic fashion. Upon examination of the firearm, the PRPOs noticed it was totally loaded with bullets. Being the firearm similar to the one used by PRPO Piazza, when he put on the safety to unload the weapon (the lock), he noticed it was very heavy and hard and it had been altered. Based on the training received by PRPO Piazza, he was taught to determine when a weapon has been altered to be fired in an automatic mode.

PRPO Piazza requested the registration of the Lincoln Navigator and proceeded to make an inventory of the content of the vehicle pursuant to the PPR 128. PROP Piazza noticed at the time the registration for the Lincoln Navigator was not under Gómez–Vega's name.

Exhibit 4 is Gómez–Vega's original drivers license.

Exhibit 4a is the registration for the Lincoln Navigator for 2003.

Exhibit 4b is the registration for the Lincoln Navigator for 2004.

Both Exhibits 4a and 4b are the registration papers of the Lincoln Navigator vehicle which was seized at the Juana Matos Housing Project. These exhibits show the Lincoln Navigator being registered under the name of Miguel Zambrana.

An inventory of the Lincoln Navigator was performed so the owner of the vehicle can see the condition and the contents of the vehicle when the inspection is made. The inspection is made in the presence of that person so there can be no claims of the contents and the conditions of the vehicle later. A PPR 128 document or form is used to conduct the inspection. The PPR 128 was used in this particular case and the inventory search was done in the presence of Gómez–Vega.

Identification 5 is the PPR–128 form used in this case which is signed with an "X" by Gómez–Vega. Gómez–Vega signed the form in the presence of PRPO Piazza after the inventory was conducted. Gómez–Vega was present when the inventory search was conducted. As part of the inventory, the Lincoln Navigator was checked to see that no other firearms where inside and that the vehicle had not been stolen. The drawers and compartments of the vehicle were inspected. The PRPOs noticed that, in the center console, there was a device which was not factory made. The agents lifted the console and saw a small compartment below. A plastic transparent bag with a zip lock type closure was found. Inside the bag there were some folded aluminum foil envelopes.

They also found inside said compartment three (3) additional gun clips, a police radio and a police scanner. A police scanner is a portable radio which is used for internal communication among the police which is a government issued radio. They also found inside the Lincoln Navigator some personal property belonging to Gómez–Vega.

Exhibit E depicts the inside front area of the Lincoln Navigator including the center console. The center console was not in the condition depicted in Exhibit E. It was easily opened because there was a screw in one of the cup holders. Normally, this kind of vehicle does not have a screw in the cup holder. Thus, when the PRPOs saw a screw in a "strange fashion", PRPO Piazza withdrew the screw and the console opened.

Exhibit B is a photograph of the interior front area of the Lincoln Navigator and the center console from the driver's side of the vehicle. The magazines found inside the console were loaded extended magazines. Among the three (3) clips or magazines there were 44 ammunitions or rounds.

The PPR–128 does not contain a notation regarding the finding of these items because, if substances or firearms are found, these are not written down in the PPR–128. What is noted in the PPR–128 is the condition of the vehicle, whether it has doors, tires, seats, compressor. The PPR–128 is not related to the findings of offensive conduct within the console. The personal items and objects inside of it were not written down either.[4]

Exhibit 6 is a photograph of the three (3) extended clips with the rounds, the firearm and the police scanner.

Exhibit 7 is a photograph depicting part of what was found inside the Lincoln Navigator, to wit: the aluminum wrappers, 267 heroin decks, the extended magazine, the Tounds, the gun, and the police scanner. The 267 heroin decks were field tested at the Metro drug unit in Bayamón. Six (6) fellow officers went there with Gómez–Vega. The field test was performed in front of Gómez–Vega and it showed positive results for heroin. When Gómez–Vega was patted down, the agents found an envelope which contained cocaine in his front right pocket. This was also field tested and yielded positive to cocaine. The baggie in Exhibit 7, the one by itself in front of the desk, is the one containing the cocaine found in Gómez–Vega's pocket.

Exhibit 8 is a photograph of the $1,500.00 which were seized from the back pant pocket of Gómez–Vega.

Gómez–Vega was asked about the controlled substances (267 heroin decks and one (1) baggie of cocaine) seized and stated he was severely addicted and these were for his personal use.

On cross-examination, PRPO Piazza testified that on December 13, 2004, he took his post at 6:00 pm until 4:00 am. On that night, there were three (3) agents in the patrol car which had a working radio. The other two (2) agents were Edilberto Mojica and Julio Gonzalez who were also assigned to the Bayamón Special Operations Division. On that day, a call was received from the Bayamón Special Operations Division through the radio at around 11:20 to 11:30 pm, when PRPO Piazza was patrolling with fellow PRPOs Mojica and González near the Juana Matos Public Housing Project. The communication transmitted via radio was of an anonymous call received at the Bayamón Special Operations

---

**4.** The government did not move the PPR–128 (Id.5) into evidence because it had no markings. (Docket No. 149, pp. 83–84).

Division pertaining to a Lincoln Navigator with five (5) heavily armed individuals. The PRPOS were told there was possibly one fugitive inside the vehicle, namely Alex Trujillo. The PRPOs called for back up and went to the Juana Matos Public Housing Project and saw the black Lincoln Navigator. When the PRPOs passed by the Lincoln Navigator, at a distance of about five (5) to seven (7) feet; they saw the indicated number of people inside the vehicle, that is, five (5) individuals. The front windshield and the front side windows of the Lincoln Navigator did not have tinted glasses. As to the five (5) persons inside the Lincoln Navigator, PRPO Piazza cannot state one of them was Alex Trujillo. After the patrol car made a U-turn to be in a more tactical position, PRPO Piazza saw four (4) persons fleeing from the Lincoln Navigator. The fifth person, who was standing next to the vehicle talking to another person inside the Lincoln Navigator, also fled. When PRPO Piazza saw those persons fleeing from the Lincoln Navigator, there was nothing the officers could do since there were only three (3) officers and there were four (4) individuals who entered inside the housing project. The PRPOs could not go after them because it would be too risky.

PRPO Piazza called for back-up before entering the Juana Matos Public Housing Project and there came a point in time in which said back-up arrived. PRPO Piazza communicated to the headquarters that the radio communication received was correct; they had found the Lincoln Navigator with five (5) persons inside; four (4) individuals fled; and they had intercepted the Lincoln Navigator and its driver. About three (3) to four (4) minutes after requesting back-up, three (3) additional patrol cars arrived from the division. They communicated via radio they were searching for the four (4) persons who fled pursuant to how these had been described.

A few minutes after intercepting the Lincoln Navigator, the officers were surrounded by people from the area. Thus, the driver of the Lincoln Navigator was placed in the patrol car and removed from the area along with the Lincoln Navigator.

During the course of the investigation, PRPO Piazza was interviewed by federal agents on December 14 or 15, 2004 but the name of Brandon Hawkins, an ATF agent, does not ring a bell. PRPO Piazza recalls telling the federal agent they saw four (4) persons getting off the Lincoln Navigator, and that one of the two (2) who had a bag in his hands, looked like Alex Trujillo. PRPO Piazza also told the federal agent that, when they were about to intervene with the Lincoln Navigator, the driver started it and made a right hand turn into a parking lot, when he got into that place, he faced a fence, tried to turn around, and then parked the vehicle. No violation as to Law 22 or any other law was committed by the driver at that time.

PROP explained that the reason why he and the other officers intervened with the Lincoln Navigator was upon receiving a call from the Bayamón Special Operations Unit from somebody who said there was a black Lincoln Navigator with five (5) people inside at the housing project, that these persons were possibly heavily armed and there was a fugitive among them who could be or might be Alex Trujillo.

On re-direct examination, PRPO Piazza testified they followed for about ten (10) seconds the Lincoln Navigator and it went about 40 feet away, including the right turn towards the fence. PRPO Piazza was outside the patrol car when Gómez–Vega exited the Lincoln Navigator. He saw Gómez–Vega stepped out of the Lincoln Navigator and throwing a pistol inside the vehicle. PRPO Piazza had received information over the radio there was a Lincoln

Navigator with five (5) individuals who were possibly heavily armed. The officers found at the location the described Lincoln Navigator which matched the previous description. They saw four (4) individuals step out of the Lincoln Navigator and take off running. PRPO Piazza saw the driver when he stepped out of the vehicle and threw a gun inside of it. Thus, at this time, PRPO Piazza felt there was a need to further investigate the incident.

## Testimony of PRPO Edilberto Mojica Caldero:

The defense presented the testimony of PRPO Edilberto Mojica which may be summarized as follows:

PRPO Mojica has been a police officer since March 29, 1996 and since 2000 he has been assigned to the Special Operations Division of the Bayamón Precinct which comprises the Juana Matos Housing Project in Catano. On December 13, 2004, he reported to work at 6:00 pm at the Bayamón South Headquarters and was assigned to the Cataño area to do preventive surveillance. PRPO Mojica was the driver of the patrol vehicle together with fellow officers Carlos Piazza Aguirre and Julio Gonzalez.

On December 13, 2004, at around 11:30 pm the PRPOs intervened at the Juana Matos Housing Project. Information about a telephone call came through the patrol car radio telling them about some individuals, including a fugitive, who were inside a black Lincoln Navigator and who were armed. The call identified the individuals as being near the Post No. 2 of the Juana Matos Housing Project. Since the officers were in the nearby area, they went into the housing project through Post No. 2. As the officers entered, a black Lincoln Navigator was observed being parked to the left and there were several individuals inside the vehicle. The officers passed by the Lincoln Navigator at some five (5) to seven (7) feet and observed the driver identified later as defendant Gómez Vega. Since the officers were not in a good position to intervene, they turned around in a parking lot which is to the right hand side and, as they were turning, four (4) individuals got out of the Lincoln Navigator running. Two (2) of the individuals had black bags in their hands. The individuals ran towards the buildings of the housing project and the Lincoln Navigator started off. The officers followed the Lincoln Navigator which then entered into a parking lot and tried to turn around. Since there were some vehicles parked and the Lincoln Navigator is a big vehicle, it became difficult to turn it around. The officers turned on the blue lights and the spotlight on the top of the patrol car. PRPOs Piazza and Gonzalez stepped out of the patrol car to intercept the Lincoln Navigator. PRPO Mojica also stepped out of the patrol car and communicated via radio to some fellow officers about the situation. PRPO Mojica stood at the corner of a nearby building looking towards the area the individuals had ran to, so as to watch out for the safety of the police officers until back-up would arrive. About twelve (12) back-up agents from the Special Operations Division arrived.

PRPO Mojica did not know who was the fugitive mentioned as being in the Lincoln Navigator. Upon being asked whether a desk officer in a police station keeps a record of the anonymous calls received, PRPO Mojica stated that it would depend on the type of call. There is a registry of anonymous calls at the Special Operations Division in Bayamón. The telephone call informed through the patrol car radio stated there was a fugitive believed to be Alex Trujillo. PRPO Mojica would not have identify Alex Trujillo because he did not know how he looked like. PRPO Mojica

did not see a fugitive coming out of the Lincoln Navigator.

The reason why the police officers intervened that night with defendant Gómez–Vega was based on the information given to the officers and the way defendant sped off in a hurry from the place. PRPO Mojica made the decision to intervene with defendant Gómez–Vega and PRPOs Piazza and González made the intervention as such.

On cross-examination, PRPO Mojica testified the Juana Matos Housing Project at night is a high crime incidence area in which several deaths had occurred during that month of December 2004. The radio message received that night indicating there was a Lincoln Navigator at the Juana Matos Housing Project matched the description of the vehicle they saw there. The description received was that there were about five (5) individuals heavily armed and that there was a fugitive. At the time the officers visually found the black Lincoln Navigator, their suspicion arose. PRPO Mojica felt, at the time when he made visual contact with the Lincoln Navigator and saw a number of people inside, that he had cause to intervene with the vehicle. Once the patrol car made the U-turn, the individuals inside the Lincoln Navigator stepped out and sped off running towards the west. Two (2) of the individuals were carrying black bags in their hands. When PRPO Mojica saw these people stepping out of the Lincoln Navigator and running towards the buildings, he believed he had further cause to intervene with the black Lincoln Navigator. In addition, the speeding off of the Lincoln Navigator from where it was previously parked furthered PRPO Mojica's intentions of intervening with the same to verify who the person was. When the Lincoln Navigator sped off, PRPO Mojica had doubts as to whether the fugitive could

still be inside the vehicle because he did not know who he was. When the driver of the Lincoln Navigator, identified as defendant Gómez–Vega, moved the vehicle he seemed at lost, like he was not from there. He speed off like trying to escape. The Lincoln Navigator got into a parking place, drove backwards but was unable to complete the Uturn because of the limited space. Once Gomez–Vega was not able to back up the vehicle, he stepped out of the vehicle and tried to run. Gómez–Vega was stopped by PRPOs Piazza and Gonzalez who intervened with him. PRPO Mojica went to a different location than fellow officers Piazza and Gonzalez because of the other individuals they had seen running and, being in a high crime area, he wanted to watch out for the safety of the officers who were performing the intervention.

On re-direct examination, PRPO Mojica testified he confirmed that there was a Lincoln Navigator on December 13, 2004 at the Juana Matos Housing Project with several persons inside. Four (4) persons exited the vehicle. The driver did not leave the Lincoln Navigator. Once the vehicle entered into a parking place, the patrol car blocked the exit to the same. After the blue lights of the patrol car were turned on, the driver stepped out of the Lincoln Navigator and tried to run towards the back of the vehicle away from the police officers.

### Testimony of PRPO Julio A. Gonzalez:

The defense presented the testimony of PRPO Julio A. González which may be summarized as follows:

PRPO Gonzalez has been working for the PRPD for twelve (12) years. PRPO Gonzalez worked at the Bayamón Special Operations Division from 2003 to 2006. On December 13, 2004, PRPO González started working the night shift in the area of Cataño with fellow officers Piazza and Mojica. They were riding in a marked

patrol vehicle and at around 11:20–11:30 pm when they received, through the patrol car radio, information indicating to them that at the Juana Matos Public Housing Project, through Post No. 2, there was a black Lincoln Navigator and there were several individuals inside the vehicle who were heavily armed. The radio communication mentioned a fugitive by the name of Alex Trujillo. They entered the Juana Matos Housing Project because of the information received through the radio.

On cross-examination, PRPO González testified the patrol car used that night was an SUV Ford Explorer of the PRPD. The call was received through the patrol car radio from the desk officer of the Bayamón Special Operations Division. When PRPO Gonzalez worked at the division, he worked on several occasions as a desk officer.

### Testimony of PRPO José Díaz Portalatín:

The defense presented the testimony of PRPO José Díaz Portalatín which may be summarized as follows:

On February 8, 2007, PRPO Diaz Portalatin worked for the PRPD directing the Special Operations Division of Bayamón. PRPO Diaz Portalatfn has worked for the PRPD for twenty three (23) years. While PRPO Dfaz Portalatfn was in charge of the Special Operations Division of Bayamón a "Libro de Confidencias" (Book of Anonymous Calls) was kept in the usual course of business. This book is kept in all the divisions which receive confidential information.

On cross-examination, PRPO Dfaz Portalatfn stated he could not attest to the fact there was a "Libro de Confidencias" at the Bayamón Special Operations Division during the year 2004.

### Testimony of PRPO Carmen Santiago Rivera:

The defense presented the testimony of PRPO Carmen Santiago Rivera which may be summarized as follows:

PRPO Santiago Rivera has worked for the PRPD since 1993. PRPO Santiago Rivera testified that, in relation to a request made to Lt. Coronel Reinaldo Bermúdez, she carried out a search pertaining to a call on December 13, 2004 in the "Libro de Confidencias" and could not find the book. The book is kept as part of the usual procedure in the Bayamón Special Operations Division.

On cross-examination, PRPO Santiago Rivera stated the book she had been searching was in use in 2004. After December 2004, the Special Operations Division moved from Bayamón to Breñas Ward in Vega Alta. The book was part of the items moved to the Breñas Station. The entire unit had moved. The search conducted by PRPO Santiago Rivera was conducted at the Breñas Station. She did not look in Bayamón because everything had been moved to the Breñas Station. The book may have been lost but she cannot attest to that.

### Testimony of PRPO Second Lt. Mario González Collazo:

The defense presented the testimony of PRPO Lt. Mario González Collazo which may be summarized as follows:

Lt. Gonzalez has worked for the PRPD for twenty two (22) years. In December 2004, he was the Coordinator of the Emergency Response Line 911 and the Director of the Radio Control Operations Center, positions he held since October 2003 up to present.

Exhibit H is a letter dated March 15, 2007 signed by Normando Duran Lugo, Director of the Board of the 911 System, which was provided to Lt. Gonzalez.

Exhibit I is the report of confidential calls received through the 911 system by Capt. Jay Dfaz Rivera dated March 7, 2007.

Exhibit J is a photocopy of a letter dated January 4, 2005 to Lt. González from Sgt. Catalino Marrero Martinez enclosing the monthly report of confidential calls received for the month of December 2004.

Exhibit K is a photocopy of the Registry of confidential calls received through the Command Center, Bayamón Area.

Exhibit L–1 to L–10 are reports for the specific dates of the calls.

On cross-examination, Lt. González stated confidential calls are not only received through the 911 system and by calling 343–2020, confidential calls may also be received at the Police Headquarters directly (in this case the Cataño Police Headquarters), by calling the Special Operations Unit or by calling the Municipal Police Headquarters.

The Special Operations Unit of Bayamón, currently located in Dorado, has its own telephone system through which emergency confidential calls may be received.

Lt. Gonzalez was asked whether every call received, either through the 911 system or by calling 343–2020, is written down or whether there were times when calls came in and the person receiving the calls failed to make a notation. Lt. Gonzalez answered that an omission could happen because the Special Operations Unit is an impact and a rapid response unit. Therefore, a call can come into the unit through the desk officer and he may forward the call to the units for a rapid response without making a written note of the call. Many times it depends on the call. For example, if it is a confidential call there is a document to be filled out but if it

is a confidential call of something that is happening at the moment, then it would be referred to rapid response and it may not be written down.

Lt. Gonzalez was aware that on 2004 there was a fugitive by the name of Alex Capó Trujillo. Lt. Gonzalez stated that in 2004 the calls related to Alex Capó Trujillo were considered rapid response calls. If the confidential call made reference to a specific place, then there was a rapid response to the call. Lt. Gonzalez, in his experience and in his collective knowledge of how the system works, would consider a phone call related to the whereabouts of Alex Capó Trujillo in the year 2004 as a phone call which required a rapid response.

In relation to the phone call at issue of December 13, 2004, which was received by the Bayamón Special Operations Unit and received a rapid response to go to the place, there is a possibility the phone call was not written down or not noted because of the emergency situation.

Lt. González was aware that in 2004 there was a Task Force looking for the Ten Most Wanted, including Alex Capó Trujillo.

On re-direct examination, Lt. Gonzalez testified he has no personal knowledge of the phone call of December 13, 2004. He is only responding to the subpoena served for which he checked the 911 system and the 340–2020 system and there was no record of the call. Lt. Gonzalez cannot say whether the call was made to the Special Operations Division. After a rapid response is made and there is an arrest, the arrest should be documented in a special report.

Lt. Gonzalez clarified that Exhibit L–1 is a document the PRPD uses in its ordinary course of business to record confidential calls. If there is a rapid response, this

form is not prepared immediately. If there is a rapid response and the target is not located, then the report is made and referred to the CIC. Confidential calls are initially documented as in Exhibit L–1 but once the information is passed to the component division to verify or to check on the confidential information, they record it in their own documents or formats. If no arrest is executed, the documents are sent to the CIC unit so it can follow through on the confidential information.

Therefore, if in December 13, 2004, an anonymous call was received (either by the Special Operations Unit, by the 911 system or by the 343–2020) and no arrest of the target was executed, a report like the one in Exhibit L-l should not have been made. Lt. Gonzalez explained that if the target is not located, the officer in charge or on duty makes a report of the call to the 343–2020 number. Then, if the target is not found, he documents this report (like Exhibit L–1) and forwards same to the CIC. Then, the CIC analyzes, together with the Task Force, all the calls related to that incident.

## LEGAL DISCUSSION

### I. Standing.

The government claims defendant Gó-mez–Vega lacks standing to challenge the evidence seized from the Lincoln Navigator vehicle he was driving because he failed to present evidence that he lawfully possessed the vehicle or had its control. Thus, the government contends Gómez–Vega had no reasonable expectation of privacy in the Lincoln Navigator. On the other hand, Gomez–Vega claims he has standing because he bought the vehicle prior to the date of his arrest and, thus, had a reasonable expectation of privacy in said vehicle.

The concept of standing under the Fourth Amendment refers to defendant's burden of proving a legitimate expectation of privacy as a prerequisite to challenge unlawful police conduct. *Sanchez,* 943 F.2d at 113 n. 1. "We therefore use the term 'standing' somewhat imprecisely to refer to this threshold substantive determination." *Id. See United States v. Cruz Jiménez,* 894 F.2d 1, 5 n. 1 (1st Cir.1990).

The term "standing" is also used as a shorthand method of referring to the issue of whether the defendant's own Fourth Amendment interests were implicated by the challenged governmental action. "Technically, the concept of 'standing' has not had a place in Fourth Amendment jurisprudence for more than a decade, since the Supreme Court in *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), indicated that matters of standing in the context of searches and seizures actually involved substantive Fourth Amendment law." *See Sánchez,* 943 F.2d at 113 n. 1; *see also United States v. Kimball,* 25 F.3d 1, 5 (1st Cir. 1994).

■ A defendant has the burden of establishing standing. *Rakas,* 439 U.S. at 138–48, 99 S.Ct. 421; *United States v. Melucci,* 888 F.2d 200, 201 (1st Cir.1989): *United States v. Hershenow,* 680 F.2d 847, 855 (1st Cir.1982). Defendant's burden of showing he had reasonable expectation of privacy in the area searched and in relation to the items seized in order to establish standing for suppression challenge must be carried at the time of the pretrial hearing and on the record compiled at that hearing. *Aguirre,* 839 F.2d at 856; *and see United States v. Mancini,* 8 F.3d 104, 107 (1st Cir.1993) (before embarking upon the merits of a suppression challenge, a criminal defendant must show that he had a reasonable expectation of privacy in the

area searched and in relation to the items seized).

■ The Court of Appeals for the First Circuit has identified the sort of factors which are pertinent to this threshold inquiry: ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case. *Aguirre*, 839 F.2d at 857; *see, e.g., United States v. Gómez*, 770 F.2d 251, 254 (1st Cir.1985); *United States v. Lochan*, 674 F.2d 960, 965 (1st Cir.1982).[5] The Court looks to whether or not the individual thought of the place (or the article) as a private one, and treated it as such. If the movant satisfies the Court on this score, then the Court looks to whether or not the individual's expectation of confidentiality was justifiable under the attendant circumstances. Whatever facts may shed light upon either step of this two-tier inquiry may be weighed in the balance. *Aguirre*, 839 F.2d at 857.

While property ownership is "clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated," *United States v. Salvucci*, 448 U.S. 83, 91, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619 (1980),

ownership alone is not dispositive. *Rawlings v. Kentucky*, 448 U.S. 98, 105, 100 S.Ct. 2556, 2561–62, 65 L.Ed.2d 633 (1980). Courts must look to the totality of the circumstances, and "any precautions taken to exclude others or otherwise maintain a privacy interest will heighten the legitimate expectation of privacy in the protected area." *United States v. One 1977 Mercedes Benz*, 708 F.2d 444, 449 (9th Cir. 1983).

■ Gómez–Vega testified at the suppression hearing only as to the standing issue.[6] Based on Gómez–Vega's testimony, we concluded at the hearing, and now we explain in further detail, he has standing to challenge the seized items under the totality of the circumstances and the evidence before the Court. Accordingly, Gómez–Vega has met the threshold established in *Aguirre* and *Lochan*.

Gómez–Vega's uncontested testimony shows he bought the Lincoln Navigator vehicle from Raul Alvarez before his arrest. Gómez–Vega paid Alvarez $9,000.00 in cash and agreed to pay the remainder "little by little." Gómez–Vega used the Lincoln Navigator daily after he bought the same and he kept personal items and documents inside the Lincoln Navigator. Gómez–Vega was in possession of the Lincoln Navigator on December 13, 2004 at the time of his arrest.

**5.** The factors that a court must take into account prior to deciding whether the defendant requesting the suppression had the expectation of privacy that grants him/her the standing to request the suppression include: 1) legitimate presence in the area searched; 2) prior use of the area searched or the property seized; 3) possession or ownership of the area searched or the property seized; 4) ability to control or exclude other's use of the property; and 5) a subjective expectation of privacy. *Lochan*, 674 F.2d at 965.

**6.** One should not lose sight of the fact that "it has been well settled for over twenty years that testimony given to meet standing requirements cannot be used as direct evidence against the defendant at trial on the question of guilt or innocence." *United States v. García–Rosa*, 876 F.2d 209, 219 (1st Cir.1989) (*citing Simmons v. United States*, 390 U.S. 377, 390, 88 S.Ct. 967, 974, 19 L.Ed.2d 1247 (1968)), Thus, a defendant should have no prejudicial consequence in admitting ownership of the drug or portions thereof to sustain standing to contest its seizure under Fourth Amendment grounds.

Gómez–Vega provided a credible explanation as to why the vehicle was not registered under his name. To this effect, Gómez–Vega explained Alvarez died before the transfer in owner was made.

As to being able to renew the vehicle's sticker without having the vehicle's registration documents, Gómez–Vega also provided a credible explanation that he obtained the same by paying a person who makes a living in renewing these documents in exchange for a fee.

Pursuant to the uncontested testimony of Gómez–Vega, it was reasonable for him to believe Alvarez was in lawful possession of the Lincoln Navigator when he transferred the possession of the same to Gómez–Vega. Evidence of this is the uncontested fact that Gómez–Vega paid Alvarez $9,000.00 for the vehicle in cash, must have received a set of keys from Alvarez since he acquired possession of the vehicle from Alvarez, used it on a daily basis thereafter, and agreed to continue making the payments of the vehicle "little by little."

In turn, the government presented no evidence whatsoever to contradict Gómez–Vega's testimony as to standing nor presented any evidence that Gómez–Vega was not in rightful possession of the same (i.e. vehicle being stolen).

In view of the above, Gómez–Vega's testimony at the suppression hearing, under the totality of the circumstances, shows he has claimed ownership of the Lincoln Navigator; had a legitimate presence in the vehicle; had prior use of the vehicle; was in control of the Lincoln Navigator the day of the arrest and for some months prior; was in possession of the vehicle; had the ability to exclude others use of the property, and thus had a reasonable expectation of privacy. *Lochan,* 674 F.2d at 965.

As such, Gómez–Vega has standing to challenge the seizure of the evidence under the totality of the circumstances and the evidence before the Court.

## II. Investigatory Stop based on Reasonable Suspicion.

Defendant Gómez–Vega argues at length in his "Memorandum in support of Defendant's Motion to Suppress" (Docket No. 156) that, under the totality of the circumstances, the officers did not have articulable reasonable suspicion defendant was involved in any criminal activity to justify intervening with him and stopping the Lincoln Navigator.

An investigative stop, also known as a Terry stop, *see Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), occurs when a police officer, "acting on reasonable and articulable suspicion of criminal activity, briefly detains an individual to confirm or dispel his suspicion." *Id.* at 6, 88 S.Ct. 1868 (citing *United States v. McCarthy,* 77 F.3d 522, 529 (1st Cir.1996)).

■ With regards to investigative stops, the Court must determine "not whether the police had probable cause to act, but instead whether the actions taken were reasonable under the circumstances." *Id.* The Court must first conclude whether the officer's action was justified at its inception. If the action is justified, the Court must then ask whether the action taken was reasonably related in scope to the circumstances which justified the interference. *Id.* To satisfy the first prong, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *United States v. Young,* 105 F.3d 1, 7 (1st Cir.1997) (citing *United States v. Kimball,* 25 F.3d 1, 6 (1st Cir.1994)). To fulfill the second prong, the Court must examine the totality of the circumstances. *See United States v. Walker,* 924 F.2d 1, 4 (1st Cir.1991); *see also United States v.*

*Acosta–Colón,* 157 F.3d 9, 14 (1st Cir. 1998).

■ Based on the abovementioned case law, we conclude the PRPOs in this case had reasonable suspicion to conduct an investigatory stop of Gómez–Vega's Lincoln Navigator vehicle. Accordingly, the investigatory stop was legal. We explain.

PROP Piazza testified that on December 13, 2004 at around 11:30 at night, he was with fellow agents Mojica and Gonzalez conducting a preventive patrolling in the area of the Juana Matos Housing Project in Cataño. A call was received via the patrol's car radio informing them that, at the Juana Matos Housing Project near the checkpoint No. 2, next to the drug point which operates there, there was a parked black Lincoln Navigator SUV. The call mentioned five (5) individuals were inside the Lincoln Navigator and that, among them, was a fugitive from the law and that supposedly these individuals were heavily armed. The officers called for reinforcement and proceeded to enter the housing project through the second entrance of the housing project, as they had been informed. When the officers entered through such entrance, they were able to confirm the information received via radio inasmuch they could observe a black Lincoln Navigator parked on the street in the entrance to the drug point in an exit position. The officers drove by the Lincoln Navigator, at about five (5) to seven (7) feet away, and saw five (5) individuals inside the vehicle and a person standing next to the vehicle on the sidewalk talking with someone inside such vehicle. PRPO Piazza testified that, when passing by the Lincoln Navigator, he saw defendant Gómez–Vega. After passing by the Lincoln Navigator, the officers turned around to be in a more tactical position in relation to the SUV. While the officers were turning around, they noticed four (4) individuals

who stepped out of the Lincoln Navigator and ran into the buildings of the housing project. Two (2) of these individuals were carrying small bags in their hands and they all ran into the interior of the housing project. The man who had been standing by the Lincoln Navigator also ran. The officers proceeded to intervene with the Lincoln Navigator and the driver of the same, identified as defendant Gómez–Vega.

The testimony of PRPO Piazza, as above summarized, was corroborated by the testimonies of PRPOs Mojica and Gonzalez, who were called by the defense at the suppression hearing. In fact PRPO Mojica testified that when he saw the persons stepping out of the Lincoln Navigator and running in the direction of the buildings at the housing project, he understood he had further cause to intervene with said vehicle. In addition, when the Lincoln Navigator driven by Gómez–Vega sped off from where it was originally parked, it furthered PRPO Mojica's intentions to intervene with the vehicle because it moved like he was trying to escape.

Based on the totality of the circumstances, we find the police officers had reasonable suspicion to stop the Lincoln Navigator based on the information received via radio coupled with the observations of the officers at the scene. The following facts support the reasonable suspicion.

First, once the officers arrived into the Juana Matos Housing Project, they were able to corroborate the information received via radio that there was a black Lincoln Navigator parked at the indicated entrance, near the drug point, with five (5) occupants.

Second, while the patrol car was turning around, the officers observed four (4) individuals stepping out of the Lincoln Naviga-

tor and running into the buildings of the Juana Matos Housing Project. Two (2) of these individuals who fled were carrying bags in their hands.

Third, the person who was outside the Lincoln Navigator talking to the occupants of the same also fled the area.

Fourth, the Juana Matos Housing Project at night is a high crime incidence area in which several deaths had occurred during that month of December 2004.

It should be noted defendant Gómez–Vega failed to offer any proof to contest the validity of the traffic stop. No credible evidence was presented by defendant to contest the fact that four (4) individuals who were with him inside the Lincoln Navigator got out of the same running and fled the scene by entering the buildings at the housing project. Defendant has not contested either the evidence proffered by the government that some of these individuals were carrying bags in their hands when they got out of the vehicle.

Defendant relies on arguments of counsel in the "Memorandum in support of Defendant's Motion to Suppress" that the PRPOs did not have reasonable suspicion to detain him. (Docket No. 156). Although we agree with the jurisprudence quoted by defense counsel as to "anonymous tips", it seems that defense counsel are conveniently obviating the facts under which the stop was made which are not limited to the facts received by the anonymous tip in this case. Once the information was received, the officers corroborated the information by entering the Juana Matos Housing Project and observing the Lincoln Navigator which had been described at the location provided. Then, the officers made some additional observations at the scene (four (4) occupants of the Lincoln Navigator stepping out of the vehicle and fleeing the scene; two (2) individuals had bags in their hands; individual outside the vehicle also fled) which has been identified as a high incidence crime area, which coupled with the tip, provided under the totality of the circumstances reasonable suspicion for the stop. This observation of the four individuals fleeing could reasonably have further heightened the officers' suspicion that the four men had run in order to avoid police detection. *United States v. Aitoro*, 446 F.3d 246, 253 (1st Cir.2006) (police officers had reasonable suspicion to justify investigatory stop of suspects, where suspects were present in a high-crime area, and when suspects noticed police, they turned and ran in the other direction); see also *United States v. Scott*, 270 F.3d 30, 41 (1st Cir.2001) ("An individual's flight from police combined with other observations by a police officer may support reasonable suspicion sufficient for detention under Terry") (citing *Illinois v. Wardlow*, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)).

Thus, even though the defense argues the information received in the anonymous tip had no information tying defendant Gómez–Vega to any illegal activity per se, said information coupled with the observations of the officers at the scene, developed into the required reasonable suspicion.[7]

7. Defendant's assertion that uncorroborated tips as a basis of reasonable suspicion or probable cause are unlawful conflicts with *Illinois v. Gates*, 462 U.S. 213, 243 n. 13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) in which the Supreme Court sustained a warrant based on an anonymous tip although the police was able to verify only innocent behavior and with *Alabama v. White*, 496 U.S. 325, 331–33, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), in which the Supreme Court concluded that less detailed anonymous tip provided reasonable suspicion to support investigative stop although police confirmed only some of the informer's predictions about defendant's innocent behavior. Both *Gates* and *White* pro-

These observations were more than sufficient to raise a "reasonable suspicion" in the mind of an experienced law enforcement agent. *United States v. Lamela,* 942 F.2d 100, 102 (1st Cir.1991); *see, e.g., United States v. Trullo,* 809 F.2d 108, 112 (1st Cir.1987) (circumstances " 'to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training' ") (quoting *United States v. Hall,* 525 F.2d 857, 859 (D.C.Cir.1976)); *United States v. McHugh,* 769 F.2d 860, 865 (1st Cir.1985) ("In assessing the import of the evidence, the expertise and experience of the law enforcement officers must also be taken into account").

Defense counsel also argued the only illegality in the tip was the alleged presence of known fugitive Alex Capó Trujillo and the "presence of five heavily armed men, including Alex Trujillo was never corroborated." (Docket No. 156, p. 16). The truth of the matter is that, based on the testimony of the police officers at the suppression hearing, the identities of the four (4) occupants who stepped out of the Lincoln Navigator and fled are unknown. Thus, it is a possibility that fugitive Alex Trujillo was among those who fled the scene and that those who fled were armed. It is also a possibility, as testified by PRPO Mojica, that fugitive Alex Trujillo would still be inside the Lincoln Navigator after some of the occupants stepped out of the vehicle.

Taking into account the consistent and credible testimonies of the PRPOs in this case, we conclude the stop in this case was not only based on the corroborated information received in the anonymous call but on the observations of the officers at the scene, Accordingly, the anonymous tip bore sufficient "indicia of reliability" to justify the Terry stop.

Finally, we must address the issue raised by the defense as to whether in fact an anonymous call was received or not at the Bayamón Special Operations Division on December 13, 2004 because there is no record of the same. From the testimony of Lt. González, witness called by the defense, it was clearly established confidential calls can be received though different means but not limited to the 911 system and the 343–2020 system. Lt. Gonzalez testified that not all confidential calls have to be documented in a written report. Thus, the fact that Lt. Gonzalez reviewed the confidential calls records for December 2004 and was not able to find the alleged anonymous call at issue, does not necessarily mean that said call was not received. Pursuant to Lt. González' testimony since the call had been received at the Special Operations Division, which is a rapid response team and since it related to a known fugitive at the time, the information would have been immediately passed along to the units and a written report may not have been prepared.

In view of the foregoing, and given the totality of the circumstances surrounding the initial investigatory stop of defendant Gómez–Vega as above summarized, we conclude the PRPOs had sufficient reasonable suspicion to make the initial stop of the Lincoln Navigator Gómez–Vega was driving on December 13, 2004.

### III. Warrantless Arrest.

 A warrantless arrest is constitutionally valid if, at moment arrest is made, officers have probable cause to make it, that is, if at that moment facts and circum-

---

vide that whether a particular tip furnishes probable cause or reasonable suspicion depends on the totality of the circumstances and that "innocent behavior frequently will provide a basis for a showing of probable cause." *Gates,* 462 U.S. at 245, n. 13, 103 S.Ct. 2317.

stances within their knowledge and of which they had reasonably trustworthy information are sufficient to warrant a prudent man in believing that the arrestee had committed or was committing an offense. *United States v. Ayres,* 725 F.2d 806 (1st Cir.1984); *Young,* 105 F.3d at 6 (same). Whether there is probable cause for a warrantless arrest is determined under an objective standard, not by inquiry into officers' presumed motives. *Id.*

Probable cause "is a practical, nontechnical conception" offering an acceptable compromise between competing societal interests in protecting citizens on the one hand from abusive interferences with privacy and unfounded charges of crime and on the other hand in recognizing the necessity to afford "fair leeway for enforcing the law in the community's protection." *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949).

A warrantless arrest requires probable cause, the existence of which must be determined in light of the information that law enforcement officials possessed at the time of the arrest. *See United States v. Diallo,* 29 F.3d 23, 25 (1st Cir.1994). To establish probable cause, the government "need not present the quantum of proof necessary to convict." *United States v. Uricoechea–Casallas,* 946 F.2d 162, 165 (1st Cir.1991); *United States v. Meade,* 110 F.3d 190, 193 (1st Cir.1997).

The inquiry into probable cause focuses on what the officer knew at the time of the arrest, *United States v. Brown,* 169 F.3d 89, 91 (1st Cir.1999), and should evaluate the totality of the circumstances. *United States v. Reyes,* 225 F.3d 71, 75 (1st Cir. 2000). "[P]robable cause is a common sense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Meade,* 110 F.3d at 198 n. 11; *United States v. Vongkaysone,* 434 F.3d 68, 73 (1st Cir.2006).

■ After evaluating the testimonies of PRPOs Piazza and Mojica, including their responsiveness and their demeanor on the stand, and the documentary evidence presented at the evidentiary hearing, this Magistrate Judge finds, pursuant to the preponderance of the evidence and considering the totality of the circumstances, defendant Gómez–Vega's warrantless arrest was lawful and based on probable cause.

Pursuant to PRPO Piazza's testimony, once the patrol vehicle was facing in the same direction of the Lincoln Navigator, after turning around, Gómez–Vega turned on the Lincoln Navigator and started moving towards a small entrance in the housing project where there is a parking space area[8]. Gomez–Vega tried to turn around the Lincoln Navigator in the parking area but had difficulty because it is a large vehicle. Once Gómez–Vega turned the Lincoln Navigator around and noticed that the patrol car was in front of him, he parked the vehicle, turned it off, and stepped out of the vehicle. The officers then observed Gómez–Vega throwing inside the Lincoln Navigator a pistol he was holding in his right hand. After Gómez–Vega threw the gun inside the vehicle, PRPO Piazza stated he assumes he (Gómez–Vega) closed the vehicle using the automatic locks. When PRPO Piazza looked through the driver's side window of the Navigator, he was able to see a gun inside on the floor in front of the passenger side seat.

8. PRPO Piazza described the parking lot is well lighted, there are two (2) utility posts, and in addition, the patrol car's headlights were on which were heading in the direction of the Lincoln Navigator and its driver.

After PRPO Piazza saw the pistol, he asked Gómez–Vega if he had a license to possess the firearm. After Gómez–Vega said he did not have a permit for the gun, the officers proceeded to read to Gómez–Vega his Miranda rights and he was placed under arrest.

The testimony of PRPO Mojica was consistent with the testimony of PRPO Piazza. PRPO Mojica testified that, after the individuals ran towards the buildings of the housing project, the Lincoln Navigator started off in way that it seemed the driver was trying to escape. PRPO Mojica explained that the fact that the Lincoln Navigator sped off from where it was previously parked furthered his intentions of intervening with the same to verify who the person was. When the Lincoln Navigator sped off, PRPO Mojica had doubts as to whether the fugitive would still be inside the vehicle because he did not know who he was. When the driver of the Lincoln Navigator, identified as defendant GómezVega, moved the vehicle he seemed lost like he was not from there. He speed off like trying to escape. The Lincoln Navigator got into the parking place, drove backwards but could not complete the U-turn because of the limited space. Once Gómez–Vega was not able to back up the vehicle, he stepped out of the vehicle and tried to run. Gómez–Vega was stopped by PRPOs Piazza and Gonzalez who intervened with him. PRPO Mojica went to a different location than fellow officers Piazza and Gonzalez because of the other individuals who ran and, being in a high crime are, he wanted to watch out for the safety of the officers who were performing the intervention.

The above factual scenario provided probable cause to perform the warrantless arrest of Gómez–Vega. Gómez–Vega was observed getting out of the Lincoln Navigator and throwing into the front passenger seat a pistol, which turned out to be a loaded 9mm pistol with an extended magazine with automatic capability. See Exhibit 3. Gómez–Vega was questioned whether he had a license for the firearm to which he answered in the negative. PRPO Piazza approached the Lincoln Navigator and observed the pistol. Thus, the officers had reason to believe defendant Gómez–Vega had committed an offense.

We note defendant Gómez–Vega did not take the stand nor presented any evidence to contest or rebut the testimony of PRPO Piazza that Gómez–Vega threw a firearm into the interior of the Lincoln Navigator when he stepped out of the vehicle. Moreover, defendant has not contested the fact that he did not have a license for said firearm. Gómez–Vega has not contested either the nature of the pistol as having an extended magazine with automatic capability. Thus, no credible evidence whatsoever has been presented by the defense to impeach or rebut the testimonies of the PRPOs in support of the warrantless arrest.

In view of the foregoing, the decision to place Gómez–Vega under arrest and take him to the Bayamón Special Operations Division was objectively reasonable based on the above. Thus, under these circumstances, the PRPOs had probable cause for Gómez–Vega's warrantless arrest.

**IV. Inventory Search.**

Defendant Gómez–Vega does not challenge the inventory search of the Lincoln Navigator in his Motion to Suppress and/or Dismiss. Nonetheless, since testimony was presented at the suppression hearing in relation to the inventory search performed in this case, we briefly discuss also the legality of the warrantless search of the Lincoln Navigator at the Bayamón Special Operations Division.

■ Following an arrest, the vehicle and all its contents and containers are lawfully subject to search. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). That is, if "probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its content that may conceal the object of the search." *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

It is common practice for the police to conduct an inventory of the contents of vehicles they have "taken into their custody or are about to impound." Wayne R. LaFave, *Search and Seizure* § 7.4 at 536 (3d ed. 1996 & Supp.2003). Such inventories "are now a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine,* 479 U.S. 367, 371, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987). These are not treated as investigative searches because they serve three administrative purposes: "the protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger." *South Dakota v. Opperman,* 428 U.S. 364, 369, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976): *United States v. Tueller,* 349 F.3d 1239, 1243 (10th Cir.2003); *United States v. Haro–Salcedo,* 107 F.3d 769, 772 (10th Cir. 1997).

■ An inventory search of an automobile is permitted where the police has lawfully impounded the automobile and the police has acted in accordance with reasonable, standard policy of routinely securing and inventorying contents of the impounded vehicle. To be permissible under the Fourth Amendment, warrantless inventory searches must be conducted according to standardized procedures. *Opperman,* 428 U.S. at372–75; *Bertine,* 479 U.S. at 374 n.

6, 107 S.Ct. 738; *Florida v. Wells,* 495 U.S. 1, 4–5, 110 S.Ct. 1632, 1635–36, 109 L.Ed.2d 1 (1990). Any "discretion [must be] exercised according to standard criteria and on the basis of something other than suspicion of criminal activity." *Bertine,* 479 U.S. at 375, 107 S.Ct. 738; *United States v. Infante–Ruiz,* 13 F.3d 498, 503 (1st Cir.1994).

Generally, "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment." *United States v. Richardson,* 121 F.3d 1051, 1055 (7th Cir.1997) (quoting *Bertine,* 479 U.S. at 374, 107 S.Ct. 738); *United States v. Lumpkin,* 159 F.3d 983 (6th Cir.1998).

■ If the Government attempts to justify the validity of the search as an inventory search, the First Circuit has decided that such claim requires definite proof been admitted regardless of any overreaching. *Infante–Ruiz,* 13 F.3d at 503–04. The Government bears the burden of showing by reference to the facts that the items would have been inevitably discovered. In addition, to be permissible under the Fourth Amendment, warrantless inventory searches must be conducted according to standardized objective procedures. *Infante–Ruiz,* 13 F.3d at 503. Any discretion must be exercised according to standard objective criteria and on the basis of something other than suspicion.

Nonetheless, courts have regularly approved inventory searches of impounded motor vehicles despite the absence of probable cause, *see, e.g., Bertine,* 479 U.S. at 371, 107 S.Ct. 738; *United States v. Ramos–Morales,* 981 F.2d 625, 626 (1st Cir.1992) (collecting cases); *United States v. Rodriguez–Morales,* 929 F.2d 780, 785 (1st Cir.1991); *United States v. Trullo,* 790 F.2d 205, 206 (1st Cir.1986), and, by like token, courts often have held that evidence

which would have turned up during an inventory search comes under the umbrella of the inevitable discovery rule, *see, e.g., United States v. Seals,* 987 F.2d 1102, 1107–08 (5th Cir.1993); *United States v. Horn,* 970 F.2d 728, 732 (10th Cir.1992); *United States v. Williams,* 936 F.2d 1243, 1248–49 (11th Cir.1991); *United States v. Mancera–Londono,* 912 F.2d 373, 375–76 (9th Cir.1990); *United States v. Arango,* 879 F.2d 1501, 1507 n. 2 (7th Cir.1989); *see also United States v. George,* 971 F.2d 1113, 1121 (4th Cir.1992) (agreeing in theory); *United States v. Jenkins,* 876 F.2d 1085, 1088 (2nd Cir.1989) (same): *United States v. Zapata,* 18 F.3d 971, 978–979 (1st Cir.1994).

██ The Government in this case met its burden by introducing evidence by the testimony of PRPO Piazza that the actions of the PRPOs were controlled by established procedures and standardized criteria of the PRPD as required by Supreme Court case law. *See Florida v. Wells,* 495 U.S. at 4–5, 110 S.Ct. 1632; *Bertine,* 479 U.S. at 374 n. 6, 107 S.Ct. 738; *Opperman,* 428 U.S. at 372–75, 96 S.Ct. 3092; *Infante–Ruiz,* 13 F.3d at 503.

We first take judicial notice of PRPD General Order No. 83–12 which establishes police procedures for the recovery of stolen vehicles. Section "VII" states that an inventory search be taken of all property found in recovered stolen vehicles and that form PPR–128 shall be completed by the officer conducting the inventory.

In the instant case, once at the Bayamón Special Operations Division, PRPO Piazza requested the registration of the Lincoln Navigator when he proceeded to make an inventory of the content of the vehicle pursuant to the PPR 128. PROP Piazza noticed the registration for the Lincoln Navigator was not under Gómez–Vega's name. See Exhibits 4a and 4b. These exhibits show the vehicle was registered to

Miguel Zambrana. PRPO Piazza proceeded to conduct an inventory search of the vehicle in the presence of Gómez–Vega pursuant to the PPR 128. An inventory of the Lincoln Navigator was performed, as required by PRPD regulations so the owner of the vehicle can see the condition and the contents of the vehicle when the inspection is made. The inspection was made in the presence of Gómez–Vega and a PPR 128 form was used in this particular case.

An inventory search of the vehicle was done because defendant Gómez–Vega Was seen by the officers throwing a firearm inside the vehicle for which defendant had no license. When the officers approached the Lincoln Navigator on site, they were able to see a firearm at plain view. Defendant Gómez–Vega stated he did not have a license to possess firearms. The officers in this case followed the PRPD regulation which requires an inventory, after a vehicle has been seized, to safeguard the people's property.

As part of the inventory, the Lincoln Navigator was checked to see that no other firearms where inside and that the vehicle was not stolen. The drawers and compartments of the vehicle were inspected. The agents noticed that, in the center console, there was a device which was not factory made. The agents lifted the console and saw a small compartment below. *See* Exhibits B, E and F. A plastic transparent bag was found with a zip lock type closure. Inside of it, there were some folded aluminum foil envelopes. They also found inside three (3) additional gun clips, a police radio and a police scanner. A police scanner is a portable radio which is used for internal communication among the police which is a government issued radio. They also found inside the Lincoln Navigator some personal property belong-

ing to Gómez–Vega. See Exhibits 6, 7 and 8.[9]

No credible evidence was presented by the defense to establish the procedure followed in this case while conducting the inventory search was irregular and not proper within the standard PRPD procedure. The defense did not present any credible evidence to contest the fact that the inventory search was indeed performed in the presence of Gómez–Vega.

We also note that no credible evidence was introduced by defendant to show the PRPOs acted in bad faith for the sole purpose of investigation in conducting the inventory search of his vehicle. *Bertine,* 479 U.S. at 367, 107 S.Ct. 738.

In this case, a warrantless search of the Lincoln Navigator was not made at the scene. An inventory search was done at the Bayamón Special Operations Division in the presence of Gómez–Vega as explained above. In any event, even if a warrantless search would have been performed of the Lincoln Navigator in this case by the PRPOs at the scene, the search would have conformed to legal standards under the "automobile exception" to search warrants and was necessary to prevent the loss of evidence, especially when, as in this case, the officers initially observed defendant in possession of a firearm he was not authorized to carry and throwing it inside the vehicle.

■ In *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the police had reasonable suspicion to believe the occupants of a vehicle were dealing drugs, based on their observation of an apparent transaction with another person minutes before. The Supreme Court held that the police could stop the vehicle, order the occupants out and conduct a search of the passenger compartment for weapons, including a locked glove compartment. Pursuant to *Michigan v. Long,* a protective frisk of the passenger compartment is valid even when the passengers have been removed from the car before the frisk takes place. *See Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997).

In this regards, it is to be noted that "the mobility of automobiles and the attendant need to prevent loss of evidence undergirds" an exception to the warrant requirement. *United States v. López,* 380 F.3d 538, 543 (1st Cir.2004). "A warrantless search of an automobile will be upheld if officers have probable cause to believe that the vehicle contains contraband." *Id.,* citing *United States v. Ross,* 456 U.S. 798, 808, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

■ In addition, the search would have been lawfully under *New York v. Belton,* 453 U.S. 454, 457, 460, 101 S.Ct. 2860, 2862, 2864, 69 L.Ed.2d 768 (1981). Under *Belton.* when a police officer makes a lawful custodial arrest of the occupant of

---

**9.** *See* Exhibit 6 is a photograph of the three (3) extended clips with the rounds, the firearm and the police scanner.

See Exhibit 7 is a photograph depicting part of what was found inside the Navigator, to wit: the aluminum wrappers, 267 heroin decks, the extended magazine, the rounds, the gun, and the police scanner. The 267 heroin decks were field tested at the Metro drug unit in Bayamón. Six (6) fellow officers went there with Gómez–Vega. The field test was performed in front of Gómez–Vega and it

showed positive results for heroin and cocaine. When Gómez–Vega was patted down, the agents found an envelope which contained cocaine in his front right pocket. This was also field tested and it yielded positive to cocaine. The baggie in Exhibit 7 which is by itself in front of the desk is the one containing the cocaine found in Gómez–Vega's pocket.

See Exhibit 8 is a photograph of the $1,500.00 which were seized from the back pant pocket of Gómez–Vega.

an automobile, the officer may, "as a contemporaneous incident of that arrest," search the car's passenger compartment and any containers found within it. *Id.* at 460–61 & n. 4. The "passenger compartment" has been interpreted to mean those areas reachable without exiting the vehicle and without dismantling door panels or other parts of the car. *See* Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 3.7 at277 (1984). The *Belton* doctrine has thus been extended to allow warrantless searches of the rear section of a station wagon and the trunk area of a hatchback, when these areas are accessible from inside the vehicle, as in this case. *United States v. Pino.* 855 F.2d 357, 364 (6th Cir.1988) (station wagon); *United States v. Russell*, 670 F.2d 323, 327 (D.C.Cir.1982) (hatchback).

In view of the foregoing, the inventory search of the Lincoln Navigator vehicle in this case was lawful and in accordance with the PRPD's standard procedures.

## V. Dismissal of the Indictment.

■■■ As the Court of Appeals for the First Circuit has affirmed, it is well established that "[a]n indictment returned by a legally constituted and unbiased grand jury, ... if valid on its face, is enough to call for trial of the charge on the merits". *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956). *See Lawn v. United States*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). The Supreme Court has also held that an indictment returned by a legally constituted an unbiased grand jury "is not subject to challenge on the grounds that the grand jury acted on the basis of inadequate or incompetent evidence". *United States v. Calandra*, 414 U.S. 338, 363, 94 S.Ct. 613, 627, 38 L.Ed.2d 561 (1974). *See United States v. Rivera Santiago*, 872 F.2d 1073 (1st Cir.1989).

On December 16, 2004, an Indictment was returned in this case by a legally constituted and unbiased Grand Jury. The return of the Grand Jury found there was probable cause to charge defendant Gómez–Vega with the offenses contained in said Indictment. Therefore, since the Indictment is valid on its face, it is enough for this case to go to trial on the merits and not be challenged at this stage.

## CONCLUSION

Based on the witnesses' testimony at the suppression hearing, including the testimony of the witnesses called by the defense, and having assessed their credibility and taking into account the documentary evidence also presented, it is determined that, pursuant to the preponderance of the evidence and considering the totality of the circumstances, Gómez–Vega has standing for the suppression of the evidence seized, there was reasonable suspicion for the initial stop of his vehicle, there was probable cause for the warrantless arrest of Gómez–Vega, the subsequent inventory search of the vehicle was legal, and thus consonant with its admissibility under the above findings and applicable law.

Furthermore, since the Indictment is valid on its face, it is enough for this case to go to trial on the merits and not be challenged at this stage.

In view of the foregoing, it is recommended that Gómez–Vega's "Motion to Dismiss the Indictment for Lack of Probable Cause to Arrest/Indict Alternate Motion to Suppress and Request for Evidentiary Hearing" (Docket No. 36) be **DENIED.**

IT IS SO RECOMMENDED.

The parties have ten (10) days to file any objections to this report and recommendation. Failure to file same within the specified time waives the right to appeal this

order. *Henley Drilling Co. v. McGee,* 36 F.3d 143, 150–151 (1st Cir.1994); *United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986). *See Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 991 (1st Cir.1988) ("Systemic efficiencies would be frustrated and the magistrate's role reduced to that a mere dress rehearser if a party were allowed to feint and weave at the initial hearing, and save its knockout punch for the second round").